# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION



| | |
|---|---|
| **TOMAS VIZCARRA, TDCJ No. 779968,** §<br>**Petitioner,** §<br>§<br>**v.** §<br>§<br>**KENNETH REAGANS, Warden,** §<br>**Respondent.** § | **EP-10-CV-159-DB** |

## MEMORANDUM OPINION AND ORDER

The Fifth Circuit Court of Appeals remanded Petitioner Tomas Vizcarra's petition under

28 U.S.C. § 2254 for a writ of habeas corpus (ECF No. 1)[1] challenging his 1997 murder

conviction[2] for further proceedings in light of the Supreme Court's decision in *McQuiggin v.*

*Perkins*, 133 S. Ct. 1924 (2013).[3]  In his petition, Vizcarra asserted he was actually innocent, the

Texas Court of Criminal Appeals erred during his state habeas proceedings, and his trial counsel

provided constitutionally ineffective assistance.[4]  Respondent Rick Thaler[5] answered by claiming

---

[1] "ECF No." in this context refers to the Electronic Case Filing number for documents docketed in this case.  Where a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the latter page numbers.

[2] *State v. Vizcarra*, No 76368 (205th Dist. Ct., El Paso County, Tex. Feb. 20, 1997), *aff'd*, *Vizcarra v. State*, No 08-97-00103 (Tex. App. – El Paso Jun. 4, 1998, pet. ref'd).

[3] *Vizcarra v. Reagans*, No. 11-50672, 2015 WL 1933671 (5th Cir. Apr 29, 2015).  *See also Vizcarra v. Thaler*, 133 S. Ct. 2763 (2013).

[4] Pet'r's Pet. 5–19, ECF No. 1, Apr. 29. 2010.

[5] Vizcarra, a prisoner at the Ramsey Unit operated by the Correctional Institutions Division of the Texas Department of Criminal Justice, named Kenneth Reagans, the Senior Warden at the Ramsey Unit, as Respondent.  However, an application for writ of habeas corpus "must name as respondent the state officer who has custody" over petitioner. 28 U.S.C. foll. § 2254 Rule 2(a).  In his petition, Vizcarra challenged a state conviction which resulted in his incarceration in the Correctional Institutions Division.  Therefore, Rick Thaler, the Correctional Institutions Division Director was the proper Respondent at the time Vizcarra filed his petition. Accordingly, Thaler filed an answer in this case.

that the statute of limitations in 28 U.S.C. § 2244(d) barred Vizcarra's petition. Alternatively, Thaler argued that infirmities in the state habeas process were not cognizable in a federal habeas action,[6] and Vizcarra failed to demonstrate that the Court of Criminal Appeals denial of his ineffective assistance of counsel claim was objectively unreasonable.[7] After noting "that a claim of actual innocence is neither an exception to the statute of limitations nor will it toll the limitations period," the Court denied Vizcarra's petition as time barred.[8] The Supreme Court subsequently held in *McQuiggin* that "a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . notwithstanding the existence of a procedural bar to relief."[9] Accordingly, the Supreme Court remanded the case for further proceedings.[10]

## BACKGROUND AND PROCEDURAL HISTORY

The evidence in the State's case file established that on evening of October 14, 1994, Daniel Ocon picked up Tomas Vizcarra at his residence. The two consumed alcoholic beverages as they cruised the streets of El Paso, Texas, in Ocon's Chevy Malibu. Upon arriving at the Ven A Verme Lounge in downtown El Paso, the two separated. Ocon stayed at a table near the dance floor while Vizcarra ordered a beer and sat near a pool table. Ocon approached two women and insisted that they dance with him. When they refused and Ocon would not leave them alone, Juan Holguin confronted Ocon and attempted to prevent Ocon from further harassing the women.

---

[6] Resp't's Answer 15, ECF No. 9. Oct. 14, 2010 (citing *Henderson* v. Cockrell, 333 F.3d 592, 606 (5th Cir. 2003)).

[7] *Id.* at 18–27.

[8] *Vizcarra v. Thaler*, EP-10-CV-159-DB, 2011 WL 2471285, at *3, *4 (W.D. Tex. Jun 20, 2011) (citing *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) ("Cousin's claims of innocence do not preclude the dismissal of his petition as untimely.")).

[9] *McQuiggin v. Perkins*, 133 S. Ct. at 1931.

[10] *Vizcarra v. Thaler*, 133 S. Ct. 2763 (2013).

The confrontation rapidly deteriorated into physical contact.  Several bar patrons intervened and forcefully removed Ocon from the lounge.  Moments later, a male with a handgun walked up to Holguin and shot him in the head.  Holguin later died of brain injuries as a result of a close-range gunshot wound to the head.

Maria Velia Carzoli Moncayo ("Carzoli"), a barmaid who had worked at the lounge for over six years, observed the incident as it developed.  Within hours of the shooting, she provided police officers with the following unsworn and unsigned statement describing the shooting:

> ON OCT. 14, 1994 I WENT IN TO WORK AT 7:00 P.M.  IT WAS BUSINESS AS USUAL FOR A FRIDAY NIGHT.  THE PLACE WAS ALMOST FULL OF PEOPLE.  I WENT ABOUT MY DUTIES.  AT APPROX. 11:30 P.M. I NOTICED THAT A MEXICAN MALE WEARING A MULTI COLORED WITH BLACK BEING THE MAIN COLOR SWEATER, STONE WASHED JEANS WAS WANTING TO DANCE WITH THE GIRL THAT WAS WITH THE GUY THAT GOT SHOT.  THE GUY WHO GOT SHOT KEPT TELLING THE GUY IN THE SWEATER TO LEAVE THEM ALONE.  I EVEN HEARD HIM AS TO PLEASE LEAVE THEM ALONE THAT SHE WASN'T GOING TO DANCE WITH HIM. THEY BOTH THEN GOT INTO A FIGHT, THE VICTIM WAS THE ONE WHO THREW THE FIRST PUNCH.  WHILE THEY WERE FIGHTING SOME OF THE REGULARS SEPARATED THEM.  THEY GOT THE VICTIM AND TOOK HIM TO THE SIDE OF THE BAR.  THE OTHERS TOOK THE GUY IN THE SWEATER OUTSIDE.  WHILE THEY WERE TAKING HIM OUTSIDE THE OTHER MAN WHO WAS WITH THE GUY WITH THE BLACK SWEATER CAME IN FROM OUTSIDE.  HE WAS WEARING DARK BLUE PANTS WITH A DARK BLUE WINDBREAKER.  HE WENT UP TO WHERE THE GUY THAT GOT SHOT WAS STANDING.  AS SOON AS HE APPROACHED HIM HE POINTED A BLACK GUN AT HIS FACE AND SHOT HIM WITHOUT EVEN SAYING ANYTHING.  AS SOON AS HE SHOT HIM HE WALKED FAST AND WENT OUTSIDE.  I THEN TOLD THE GUYS TO HOLD HIM.  HE WENT OUT THE FRONT DOOR AND I WENT OUT THE REAR DOOR.  JUST BEFORE HE GOT TO THE CAR I GRABBED HIM FROM THE JACKET AND TOLD HIM NOT TO LEAVE. I THEN YELLED AT THE GUYS SO THAT THEY WOULD GO TO WHERE I WAS AT.  THE GUY WHO SHOT THE OTHER THEN GOT INTO A BLUE MALIBU AND STARTED THE CAR.  BY THIS TIME THE GUYS GOT THERE.  ONE OF THE GUYS PARKED HIS

CAR BEHIND THE MALIBU. THE GUY IN THE MALIBU THEN TRIED TO PUSH THE CAR PARKED BEHIND HIM AWAY SO THAT HE COULD LEAVE.  I COULD EVEN SEE A LOT [SIC] OF SMOKE COMING FROM THE TIRES OF THE MALIBU.  THE GUYS THEN OPEN THE DOOR AND I THEN TOLD THEM THAT HE WAS THE ONE WHO HAD SHOT THE OTHER GUY.  THE GUY IN THE MALIBU THEN POINTED TO ME AND TOLD ME TO SHUT UP FOR ME NOT TO SAY ANYTHING.  HE THEN REACHED DOWN FOR THE GUN AND THATS [SIC] WHEN EL CHANGO STARTED TO BEAT HIM UP, AND THEY HELD HIM FOR THE POLICE. A SHORT MAN DRESSED IN BLUE GOT THERE IN A TRUCK AND TOLD THEM THAT HE WAS A POLICEMEN AND FOR NOBODY TO LEAVE.  WE THEN WAITED FOR THE POLICE TO ARRIVE.  THEN THEN [SIC] BROUGHT US HERE TO THIS OFFICE.

I HAVE BEEN SHOW [SIC] 2 MEXICAN MALES AND I HAVE POSITIVELY IDENTIFIED THEM AS BEING THE ONES WHO WERE INVOLVED IN THE SHOOTING. THE GUY WHO AS WEARING THE BLACK MULTI COLORED SWEATER AND THE STONEWASHED JEANS WAS THE ONE WHO STARTED EVERYTHING AND THE ONE WITH NO SHIRT AND DARK BLUE PANTS WAS THE ONE WHO I SAW SHOOT THE OTHER GUY. I DON'T KNOW THE NAME OF THE GUY WHO GOT SHOT BUT HE WAS A REGULAR CUSTOMER OF THE BAR.  THE ONE IN THE SWEATER ALSO IS A REGULAR CUSTOMER BUT THE ONE WHO DID THE SHOOTING WAS THE FIRST TIME THAT I SAW HIM AT THE BAR.[11]

Based on Carzoli's statement and other evidence, a state grand jury in El Paso returned an indictment charging Vizcarra with Holguin's murder.  The indictment specifically alleged Vizcarra caused Holguin's death by shooting him in the head with a firearm.  Although police officers arrested Ocon along with Vizcarra, a grand jury never indicted Ocon for Holguin's murder.  Vizcarra pleaded not guilty and proceeded to trial.

---

[11] Pet'r's Pet, Ex. D-1 (Unsworn Statement of Martha Velia Carzoli Moncayo), ECF No. 1-1, Apr. 29, 2010.

According to Vizcarra's attorney, "the trial strategy was to attempt to convince the jury that Daniel Ocon was the murderer. . . . The state had one identification witness, Martha Carzoli."[12]  During Carzoli's direct examination, she identified Vizcarra as the shooter:

Q      Okay.  And will you take at look at state's Exhibit Number Four, which is a picture of Daniel Ocon.  Is that Daniel Ocon?

A      Uh-huh.  Yes.

Q      And when was the first time that you saw him in the bar; not the day of the shooting, but the first time you saw him came into the bar?

A      Well, he used to go frequently.

Q      Okay.  So, he would be considered a regular?

A      Well, not exactly a regular; but, yes.

Q      He would go to the bar?

A      Yes.

        . . . .

Q      (BY MR. LIGON:)  Okay. Now, State's Exhibit Number Three -- which is Tomas Vizcarra -- before October 14th, 1994, did you see him in the bar?

A      No, ma'am.  I had never seen him before.  It was the first time that I saw him.

        . . . .

Q      Now, did you at any point see Tomas Vizcarra and Daniel Ocon get into an argument with Juan Holguin, the person who was shot that night?

A      Yes.

Q      And which two got in an argument?

A      This one, Ocon, and the Cholo.

Q      That would be Daniel Ocon and Juan Holguin got into an argument; that's what you saw?

A      Yes.

Q      And where was Tomas Vizcarra when this happened?

A.     Standing there by a pole, just near, close to him.

        . . . .

Q      Okay. Now, can you tell me what happened or. what did Juan·Holguin, the person that you call Cholo, do to Daniel Ocon.

A      He didn't do anything.  The one with the sweater, or wearing a sweater, was the one that wanted to invite Cholo's girlfriend. But, he didn't allow that.

        . . . .

_____

[12] Pet'r's Pet. 21 (Aff. of Matthew DeKoatz), ECF No. 1, Apr. 29, 2010.

Q       Now, after Mr. Holguin got up and started talking to Mr. Ocon, what happened then?

A       Well, they just wanted to fight;- but in there, no one allowed it to happen.

Q       Okay.  And so, what happened to Daniel Ocon and Tomas Vizcarra and after they tried to fight?

A       Nothing.  They were kicked out of the bar and then the guy with the tattoo --·

        . . . .

Q.      Now, at any point, did Daniel Ocon or Tomas Vizcarra come back into bar?

A       Only the one with the -- Number Three.

Q       I'm showing you State's Exhibit Number Three.  That's a picture of Tomas Vizcarra.  Is that the one?

A.      Yes.

Q.      Did Daniel Ocon come back into the bar?

A.      No.  No stayed in the door.

Q       Okay.

A       Or by the door.

Q       Okay. Now, what did Tomas Vizcarra do when he came back into the bar?

A.      He just came in, and pulled out a gun and shot El Cholo.  That· was all he did.

        . . . .

Q       (BY MR. LIGON:) When Tomas Vizcarra came in through the front door, where did he have the gun?

A       Immediately·towards where the Cholo was.

Q       Where did he have the gun?

A       He took it out.  I don't know where from; a jacket or something that he had on.

Q       Now, did he already have the gun out when he came in the door or he took it out when he was walking towards the door?

A       He took it out when he was on his way.

Q       And did you see-- did he say anything to the Cholo, Mr. Juan Holguin?

A       No.  When he killed him?  No.

Q       Did Juan Holguin say anything to him?

A       No.  How could he do that when he was on his back when he received the shot?

        . . . .

Q       Okay.  Now, is the person who shot Juan Holguin in the courtroom today?

A     Yes.

Q     Can you point him out and describe· what- he's wearing today

A     Yes. · A white shirt, a blue tie and black shoes.

MR. LIGON:  Your Honor, may the record reflect that·the witness has identified Tomas Vizcarra as the shooter in this case.

THE. COURT: The record shall reflect.

. . . .

Q     (BY MR. LIGON:).  I'm showing you what has been marked as State's Exhibit Number Three. Can you give a description to the jury of what that person looks like.

A     He doesn't wear a T-shirt and he's tattooed and he's wearing black pants, white socks and black shoes.

Q     Does he have one tattoo or more than one tattoo?

A     He has a lot of them

Q     Now, what did the people inside the bar do after Mr. Vizcarra tried to run out the door?

Q     We first screamed and then we tried to catch him, because he wanted to leave.

Q     Who tried to catch him?

A     Several clients that were there in the bar.

Q     Do you remember how many of them?

A     The ones that were -- that went after him.  It was about five, or four or five.

Q     And were you able to catch him inside the bar?

A     No.

Q     Where'd he go?

A     When he was about to get into his car.

Q     What about Daniel Ocon; where was he?

A     He was already in the car.

Q     And did Daniel Ocon ever come back into the bar after he was thrown out that night?

A     No.

Q     Now, did -- when you all got outside, did the people in the bar beat up Tomas Vizcarra and Daniel Ocon?

A.     No.

Q     Did they --

A.     What they did is, they only tried to hold them, because they wanted to leave.

Q     Well, while in the process, did Daniel Ocon and Tomas Vizcarra get scratched up or have marks on them?

A     Well, yeah because, they struggled and wrestled because they wanted to leave and we didn't want them to leave.

Q    Did all of this happen before Juan Holguin got shot or after Juan
     Holguin got shot?
A    No. No. It was after he killed the Cholo. Then, this is when all of us
     held them so that they wouldn't leave.
Q    Now, were you, yourself, outside trying to hold these people back; I
     mean, trying to keep them from leaving?
A    Yes.
Q    How many other people were out there?
A    Adrian, and Chino, and two other young boys that I don't know, and
     another lady and me.
Q    And did somebody park their car in front of the vehicle that Tomas
     Vizcarra and Daniel Ocon were in?
A    Yes. Chino.
     . . . .
Q    Do you have a good view of Tomas Vizcarra when he shot Juan
     Holguin?
A    Yes, ma'am.
Q    How many shots did you hear inside that bar that night?
A    Only one.
Q    How many shots did you hear outside the bar that night?
A    None.
Q    Now, Tomas Vizcarra had a gun in his hand. Did he have the gun in
     his hand the entire time?
A    Yes.
Q    Did you ever see Daniel Ocon with a gun in his hand?
A    No.[13]

On cross examination, Carzoli added that Ocon had cashed checks at the lounge, but

explained her recollections of the events on the evening of October 14, 1994 were less than perfect

because a long time had passed since the shooting:

Q    Okay. Very well. And Mr. Ocon, what did you know him as?
A    Because he used to go there also.
Q    Did you know him by his name or by his face?
A    By his face.
Q    Very well. Who told you his name was Daniel Ocon?
A    Because we cashed checks for him about two or three times.

---

[13] *Id.*, Ex. J (Trial Tr., Testimony of Martha Velia Carzoli), Document 1-3, pp. 22–24,
26–29, Document 1-4, pp. 1–5.

. . . .

Q       And now two years have gone by, right?

A       Yes, ma'am..

Q       You are remembering things a little bit differently than what you told
        the police, right?

A       Well, I think yes; because, it's been a long time and I didn't
        remember well.[14]

On February 6, 1997, after hearing the evidence and arguments of counsel, the jury found

Vizcarra guilty of murder as alleged in the indictment.  The following day, the jury assessed

Vizcarra's punishment at 99 years' imprisonment.[15]  The Eighth Court of Appeals of Texas

affirmed the conviction on June 4, 1998,[16] and the Texas Court of Criminal Appeals refused

Vizcarra's petition for discretionary review on December 2, 1998.[17]

Vizcarra filed an application for state writ of habeas corpus challenging this conviction on

August 10, 2007.  Appended to the application was an affidavit from Carzoli, dated November

11, 2006, in which she said she was no longer sure about her eyewitness identification:[18]

> Recently; the attorneys representing Mr. Vizcarra in a proceeding to
> set aside the guilty verdict demonstrated to me that discrepancies and
> inconsistencies existed in my original testimony.  These attorneys
> also pointed out to me the content of my original statement and testimony, which
> reflects that I followed the shooter out to a Chevy Malibu, which he started
> up and attempted to drive off in before I and other patrons of the lounge
> pulled him out of the vehicle and held him for the police.  This is true.  They
> also pointed out to me that one Daniel Ocon admitted to leaving the scene
> right after the shooting, and to starting up the Chevy Malibu which the
> shooter entered before being pulled out of the vehicle. ·If this is true, it would
> appear that Mr. Ocon may have been the shooter and the person I followed

---

[14] *Id.*, Ex. J., Document 1-4, pp. 11, 16.

[15] *State v. Vizcarra*, No 76368 (205th Dist. Ct., El Paso County, Tex. Feb. 20, 1997).

[16] *Vizcarra v. State*, No 08-97-00103 (Tex. App.–El Paso Jun. 4, 1998).

[17] *Vizcarra v. State*, PD-1303-98 (Tex. Crim. App. Dec. 2, 1998).

[18] Pet'r's Pet. 7, n.7, ECF No. 1, Apr. 29, 2010.

out of the Ven A Verme Lounge on the evening of the shooting which resulted in the death of the other male individual in the Ven A Verme Lounge.

Please understand that I am not saying that Mr. Ocon was the shooter. I merely wish to state that I was not really sure of the identification I made on this date. This is the truth. Knowing Ocon's admission to having tried to drive off after the shooting, I am now concerned that I mistakenly identified Mr. Vizcarra as the shooter. The Lounge, was poorly lit on the evening of the shooting and with the many people inside the Lounge, it was an impossible task to observe everything that occurred. At the time, I was mad and wanted to help and I was angry about what had occurred in the Lounge. But now I am not sure about my identification. Accordingly, I hereby recant and now state that  am not sure that the person responsible for the shooting in the Ven A Verme Lounge was Tomas Vizcarra.[19]

The Court of Criminal Appeals denied Vizcarra's application without written order on May 21, 2008. Vizcarra filed the instant § 2254 petition on April 29, 2010.

In his § 2254 petition, Vizcarra asserted the following grounds for relief:

1. The Court of Criminal Appeals erred during the state habeas proceeding, when it denied Vizcarra's free-standing, actual innocence claim;

2. Vizcarra was denied the effective assistance of counsel because trial counsel:

(a) failed to develop the information contained in Martha Carzoli's written statement regarding the events occurring after the shooting;

(b) failed to call Daniel Ocon as a witness to establish that Ocon actually fired the gun that killed the decedent;

(c) failed to question Adrian Cellar Sanchez about his post-shooting observations;

(d) failed to establish the locations of various items of clothing, by means of a crime scene report;

---

[19] *Id.*, Ex. M (Aff. of Martha Carzoli), ECF No. 1–4, pp. 30–31.

   (e) failed to call Benito Poundage, Jr., to testify regarding his written statement;

   (f) failed to question Jose Diaz Esparza about his written statement;

   (g) failed to prove that Ocon owned the vehicle "used by the shooter" to flee;

   (h) failed to discuss the results of a gunshot residue test performed on both Vizcarra and Ocon;

3. The state habeas procedures were erroneous because they failed to give due consideration to the post-trial affidavit provided by Martha Carzoli; and

4. The Court of Criminal Appeals failed to provide Vizcarra a fair and adequate hearing on his Article 11.07 actual innocence claim by basing its rulings on the inaccurate findings and conclusions of the State.[20]

  Respondent Rick Thaler maintained in his answer that the one-year limitations period in 28 U.S.C. § 2244(d) barred Vizcarra's claims.[21] In its memorandum opinion and order, the Court noted the limitations period ran from the latest of four different events: (1) when "the judgment became final," (2) when "the impediment to filing an application created by the State action in violation of the Constitution and laws of the United States is removed, if the applicant was prevented from filing by such State action," (3) when "the constitutional right asserted was initially recognized by the Supreme Court . . . and made retroactively applicable to cases on collateral review," or (4) when "the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."[22] After reviewing the record, the Court determined that Vizcarra had filed his § 2254 petition eleven years after his conviction became

---

[20] Pet'r's Pet. 5–19.

[21] Resp't's Resp. 1, ECF No. 9, Oct. 14, 2010.

[22] Mem. Op. Order 4, ECF No. 10, June 20, 2011 (quoting 28 U.S.C. §§ 2244(d)(1)(A)–(C)).

final, the State had not impeded his timely filing of a § 2254 petition, and Vizcarra had not based his claims on a right newly recognized by the Supreme Court. Moreover, it determined that Carzoli's affidavit, the factual predicate for his claim, did not cure the untimeliness because Carzoli signed it on November 11, 2006—some twelve years after the shooting—but Vizcarra delayed filing his state application nine months until August 10, 2007. Furthermore, although the Court of Criminal denied his state writ application on May 21, 2008, Vizcarra waited nearly two years to file his § 2254 petition on April 29, 2010. Accordingly the Court determined that Vizcarra untimely filed his petition and denied him relief.

The Fifth Circuit denied Vizcarra a certificate of appealability,[23] but the Supreme Court remanded the case to the Fifth Circuit "for further consideration in light of *McQuiggin v. Perkins*, 569 U.S. ___, 133 S.C. 1924, 185 LED.2d 1019 (2013)."[24] The Fifth Circuit, in turn, remanded the case to this Court "[a]s to his claims of ineffective assistance of counsel . . . for further proceedings in light of the Supreme Court's decision in *Perkins*."[25] The Fifth Circuit denied Vizcarra's motion for a certificate of appealability as to his state-law challenges, however, explaining "[t]o the extent that [his] underlying claims challenge the procedural adequacy of state post-conviction proceedings, he fails to raise a cognizable issue under § 2254 because 'infirmities in state habeas proceedings do not constitute grounds for federal habeas relief.' "[26]

---

[23] *Vizcarra v. Reagans*, No. 11-50672 (5th Cir. Apr. 13, 2012).

[24] *Vizcarra v. Thaler*, 133 S.Ct. 2763 (2013).

[25] *Vizcarra v. Reagans*, No. 11-50672, 2015 WL 1933671 (5th Cir. Apr 29, 2015).

[26] *Id.* (quoting *Duff–Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992)).

## APPLICABLE LAW

### A.  Collateral Review under 28 U.S.C. § 2254

"[C]ollateral review is different from direct review,"[27] and the writ of habeas corpus is

"an extraordinary remedy"[28] reserved for those petitioners whom "society has grievously

wronged."[29]  It "is designed to guard against extreme malfunctions in the state criminal justice

system."[30]  It provides an important, but limited, examination of an inmate's conviction and

sentence.[31]  Accordingly, the federal habeas courts' role in reviewing state prisoner petitions is

exceedingly narrow.  "Indeed, federal courts do not sit as courts of appeal and error for state

court convictions."[32]  They must generally defer to state court decisions on the merits[33] and on

procedural grounds.[34]  They may not grant relief to correct errors of state constitutional, statutory,

or procedural law, unless a federal issue is also present.[35]

---

[27] *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).

[28] *Id.*

[29] *Id.* at 634.

[30] *Id.* (citing Justice Stevens's concurrence in *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

[31] *See Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 787 (2011) ("[S]tate courts are the principal forum for asserting constitutional challenges to state convictions.").

[32] *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

[33] *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

[34] *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991); *Muniz v. Johnson*, 132 F.3d 214, 220 (5th Cir. 1998).

[35] *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).

A federal court can only grant relief if "the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law,' "[36] or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[37]  The focus of this well-developed standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."[38]

Moreover, the federal court's focus is on the state court's ultimate legal conclusion, not whether the state court considered and discussed every angle of the evidence.[39]  Indeed, state courts are presumed to know and follow the law."[40]  Factual findings, including credibility choices, are entitled to the statutory presumption, so long as they are not unreasonable "in light of the evidence presented in the State court proceeding."[41]  Further, factual determinations made by a state court enjoy a presumption of correctness which the petitioner can rebut only by clear and convincing evidence.[42]  The presumption of correctness applies not only to express findings of

---

[36] *Berghuis v. Thompkins*, 560 U.S. 370, 378 (2010) (quoting 28 U.S.C. § 2254(d)(1)).

[37] 28 U.S.C. § 2254(d)(2).

[38] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[39]*Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see also Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("we review only the state court's decision, not its reasoning or written opinion").

[40] *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

[41]28 U.S.C. § 2254 (d)(2).

[42] 28 U.S.C. § 2254(e)(1); *see Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006) (noting that a state court's determination under § 2254(d)(2) is a question of fact).

fact, but also to "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."[43]

Claims under § 2254 are generally subject to a one-year statute of limitations.[44]  In *McQuiggin*, the Supreme Court determined "actual innocence, if proved, serves as a gateway through which a petitioner may pass . . . the. . . expiration of the statute of limitations."[45]  The Supreme Court added, "[i]n other words, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief."[46]  However, "[a] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."[47]  Moreover, "in making an assessment 'the timing of the [petition]' is a factor bearing on the 'reliability of th[e] evidence' purporting to show actual innocence."[48]  Furthermore, in *Herrera*, the Supreme Court stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."[49]  Similarly, in

---

[43] *Valdez v. Cockerel*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

[44] *See* 28 U.S.C. § 2244(d)(1) (2012) ("A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.").

[45] *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013).

[46] *Id.* at 1931.

[47] *Id.* at 1928 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)); *see House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is "demanding" and seldom met).

[48] *Id.* (quoting *Schlup*, 513 U.S. at 332).

[49] *Herrera v. Collins*, 506 U.S. 390, 399 (1993).

*Schlup*, the Supreme Court noted that a petitioner's "claim of innocence does not by itself provide a basis for relief."[50]  Following that reasoning, the Fifth Circuit has repeatedly and unequivocally held that the Constitution does not endorse an independent actual-innocence ground for relief.[51]

In sum, the federal writ serves as a "guard against *extreme malfunctions* in the state criminal justice systems," not as a vehicle for error correction.[52]  "If this standard is difficult to meet, that is because it was meant to be."[53]

### B.   Ineffective Assistance of Counsel

Generally, an ineffective-assistance-of-counsel claim presented in a § 2254 petition is analyzed under the test set forth by the Supreme Court in *Strickland*.[54]  Under *Strickland's* two-pronged inquiry, "[t]o establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.' "[55]  This means that a petitioner must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and

---

[50] *Schlup*, 513 U.S. at 315.

[51] *Kinsel v. Cain*, 647 F.3d 265, 270 n.20 (5th Cir. 2011).

[52] *Harrington v. Richter*, 562 U.S. 86, 131 S.C. 770, 786 (2011) (citation omitted) (emphasis added).

[53] *Id.*

[54] *Strickland v. Washington*, 466 U.S. 668 (1984).

[55] *Premo v. Moore*,562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

sentence.[56] If the petitioner fails to prove one prong, it is not necessary to analyze the other.[57] "Surmounting *Strickland's* high bar is never an easy task."[58] When the state courts have already adjudicated the merits of a *Strickland* claim, "[a] state court must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."[59] In sum, federal statutes give wide latitude to the state adjudication of a *Strickland* claim through a "doubly deferential judicial review."[60]

## ANALYSIS

### A.    Actually Innocent

Vizcarra complains "the Court of Criminal Appeals failed to give due consideration to the post-trial affidavit provided by Martha Carzoli submitted with [his writ] application" which, he suggests, establishes his actual innocence.[61] He maintains "Carzoli *recanted* her eyewitness testimony which identified Vizcarra as the person who shot and killed the decedent."[62] He adds "Carzoli confessed that she was not sure of her original eyewitness identification."[63]

> In owning up to this point, Carzoli related in this affidavit that she did not
> realize when she gave her trial testimony that her eye-witness identification

---

[56] *United States v. Dovalina*, 262 F.3d 472, 474–75 (5th Cir. 2001).

[57] *See Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir.1994) ("A court need not address both components of the inquiry if the defendant makes an insufficient showing on one"); *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir.1997) ("Failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.").

[58] *Padilla v. Kentucky*, 559 U.S. 356, 371(2010).

[59] *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 785 (2011).

[60] *Knowles*, 556 U.S. at 123; *see also Cullen v. Pinholster*, 131 S.C. 1388, 1410 (2011).

[61] Pet'r's Pet. 15, ECF No. 1, Apr. 29, 2010.

[62] *Id.* (emphasis added).

[63] *Id.*

of Vizcarra as the person who killed the decedent was inconsistent with the post-shooting account of events she detailed in her original written statement to the police.  In particular, Carzoli indicated in her affidavit that she was unaware at the time she testified that Daniel Ocon had confessed to the police in a written statement to being the person who she chased out of the Ven-A-Verme Lounge right after the shooting to a Chevy Malibu, that Ocon had admitted to starting up his Chevy Malibu and to having attempted to flee the crime scene before he was pulled him from the vehicle.  Carzoli also explained that she was upset about the shooting and indicated that she should have been more careful about her eyewitness identification, given the poor lighting conditions inside the lounge and the large crowd of people who had congregated inside the lounge on the evening of the shooting.[64]

To establish actual innocence, petitioner must demonstrate that, " 'in light of all the evidence,' " "it is more likely than not that no reasonable juror would have convicted him."[65]  As the Supreme Court has explained, to show the actual innocence necessary to overcome a procedural default in the habeas context, " 'actual innocence' means factual innocence, not mere legal insufficiency."[66]  Moreover, as the Supreme Court explained in *Schlup*:

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with *new reliable evidence*–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–*that was not presented at trial.*[67]

In support of his actual innocence claim, Vizcarra first provides copies of unsworn, written witness statements made to the police after the incident.  Carzoli did report in her unsworn statement, which she gave to the police within hours of the shooting, that "[t]he guy

---

[64] *Id.*

[65] *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 327–328 (1995)).

[66] *Id.* at 623–24 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

[67] *Schlup*, 513 U.S. at 324 (emphasis added).

-18-

who shot the other then got into a blue Malibu and started the car."[68]  However, she also said "the guy who was wearing the black multi colored sweater [Ocon]. . . was the one who started everything and the one with no shirt and dark blue pants [Vizcarra] was the one who [she] saw shoot the other guy."[69]  She then added "[t]he one in the sweater [was] a regular customer but the one who did the shooting was the first time that I saw him at the bar."[70]  Presumably, Carzoli could distinguish between a regular patron and a new customer at the time of the shooting. Furthermore, Ocon maintained in his unsworn statement that he saw Vizcarra shoot the victim:

> Yo nomas vi que Tommy estiro la mano y tiro un plomaso a un vato. Vi que Tommy tenia algo brilloso. . . . Tommy era el que tiro el plomaso con una pistola que estaba brillosa.[71]

The statements are not new and do not tend to reliably prove Vizcarra's innocence.  They do not suggest that Vizcarra could not have been the shooter.  In fact, the statements by Carzoli and Ocon identify Vizcarra as the shooter.

Vizcarra then provides portions of the original trial testimony taken approximately twenty-seven months after the incident, and suggests the cited portions of the transcript do not strongly establish Vizcarra's guilt.  At trial Carzoli unequivocally identified Vizcarra as the shooter:

> Q      Okay.  Now, what did Tomas Vizcarra do when he came back into the bar?

---

[68] Pet'r's Pet, Ex. D-1 (Unsworn Statement of Martha Velia Carzoli Moncayo), ECF No. 1-1, Apr. 29, 2010.

[69] *Id.*

[70] *Id.*

[71] *Id.*, Ex. D-2 (Unsworn Statement of Daniel Montoya Ocon) (Translated into English, Ocon said "I just saw Tommy [Vizcarra] stretch his hand and shot a guy.  I saw that Tommy had something shiny. . . . .Tommy is the one that shot with a gun that was shiny.").

A.      He just came in, and pulled out a gun and shot El Cholo. That· was
        all he did.[72]

Vizcarra's theory appears to be that when Carzoli's unsworn statements are weighed against

Carzoli's inculpatory testimony, the jury might have had a reasonable doubt as to Vizcarra's

guilt.  Because his arguments challenge the legal sufficiency of the evidence available at his trial,

and do not present "new reliable" evidence, they are not persuasive under *Schlup*.[73]

The only "new" evidence Vizcarra presents is an affidavit by Martha Carzoli taken twelve

years after the incident.  Vizcarra maintains that Carzoli "recanted her eyewitness testimony of

Vizcarra as the person who shot and killed the decedent" in this affidavit.[74]  Carzoli does not, as

Vizcarra suggests, recant her earlier testimony in her affidavit.  She merely suggests she *may*

have erred in identifying Vizcarra as the shooter:

> Daniel Ocon admitted to leaving the scene right after the shooting, and to
> starting up the Chevy Malibu which the shooter entered before being pulled
> out of the vehicle.  *If this is true, it would appear that Mr. Ocon may have
> been the shooter* and the person I followed out of the Ven A Verme Lounge
> on the evening of the shooting which resulted in the death of the other male.[75]

Notably, Carzoli does not now claim that Ocon was the shooter.  In fact in Ocon's unsworn

statement, he claims that he also saw Vizcarra shoot the victim.  Stated differently, Carzoli's

affidavit only shows that she is no longer certain regarding her identification of the shooter

twelve years after the incident.  This affidavit is clearly not the new and trustworthy eyewitness

account envisioned in *Schlup*.[76]

---

[72] *Id.*, Ex. J (Trial Tr., Testimony of Martha Velia Carzoli), Document 1-3, pp. 22–24.

[73] *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

[74] Pet'r's Pet. 15, ECF No. 1, Apr. 29, 2010.

[75] *Id.*, Ex. M (Aff. of Martha Carzoli), ECF No. 1–4, pp. 30–31 (emphasis added).

[76] *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

In sum, Vizcarra has presented no new, reliable evidence to establish that he could not have committed the offense for which he was convicted. Stated differently, because a jury could still believe Carzoli's prior testimony that Vizcarra was the shooter, Vizcarra cannot demonstrate that it is more likely than not that no reasonable juror would have convicted him in light of the evidence actually presented at trial.

Furthermore, unlike federal law, Texas law recognizes an inmate's innocence as a ground for relief.[77] When Vizcarra asserted his innocence in his state habeas application, the Court of Criminal Appeals rejected his argument. Factual determinations made by a state court enjoy a presumption of correctness which the petitioner can rebut only by clear and convincing evidence.[78] Vizcarra has not provided clear and convincing evidence that the Court of Criminal Appeals erred when it rejected his actual innocence claim.

Vizcarra has not made a "credible showing of actual innocence" which would allow him "to pursue his constitutional claims . . . notwithstanding the existence of a procedural bar to relief."[79] His petition is time barred and he may not obtain § 2254 relief.

## B.    Ineffective Assistance of Counsel

Assuming for the sake of argument that Vizcarra's claims are not procedurally barred, he is still not entitled to § 2254 relief. The Fifth Circuit granted a certificate of appealability only as to Vizcarra's ineffective assistance of counsel claims.[80] Before the Court will grant Vizcarra relief on these claims, he must demonstrate "the state court's adjudication of the merits was

---

[77] *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996); *State ex rel. Holmes v. Court of Appeals for the Third District*, 885 S.W.2d 389 (Tex. Crim. App. 1994).

[78] 28 U.S.C. § 2254(e)(1); *see Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006) (noting that a state court's determination under § 2254(d)(2) is a question of fact).

[79] *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013).

[80] *Vizcarra v. Reagans*, No. 11-50672, 2015 WL 1933671 (5th Cir. Apr 29, 2015).

'contrary to, or involved an unreasonable application of, clearly established Federal law,' "[81] or

"resulted in a decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding."[82]  Furthermore, deference to a state court's

determination that finds no *Strickland* violation is particularly strong:

> The question is not whether a federal court believes the state court's
> determination under the *Strickland* standard was incorrect but whether that
> determination was unreasonable—a substantially higher threshold.  And,
> because the *Strickland* standard is a general standard, a state court has even
> more latitude to reasonably determine that a defendant has not satisfied that
> standard.[83]

Hence, the Court of Criminal Appeals rejection of Vizcarra's claims is entitled to very strong

deference, which Vizcarra fails to overcome.  In his petition, Vizcarra does not argue that the

Court of Criminal Appeals misapplied clearly established federal law or made an unreasonable

determination based on the facts presented at trial.  Moreover, he does not overcome the " 'strong

presumption' that counsel's representation was within the 'wide range' of reasonable

professional assistance."[84]  He simply reasserts the same claims that he made in his state

proceedings, and makes no effort to meet the statutory requirements for relief.[85]  As such, the

Court must deny his claims.[86]

---

[81] *Berghuis v. Thompkins*, 560 U.S. 370, 378 (2010) (quoting 28 U.S.C. § 2254(d)(1)).

[82] 28 U.S.C. § 2254(d)(2).

[83] *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotations omitted).

[84] *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citation omitted).

[85] 28 U.S.C. § 2254(d).

[86] *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).

## EVIDENTIARY HEARING

A court will hold an evidentiary hearing on a § 2254 petition only when the petitioner

shows either (1) the claim relies on a new, retroactive rule of constitutional law that was

previously unavailable or (2) a factual basis that could not have been previously discovered by

the exercise of due diligence and the facts underlying the claim show by clear and convincing

evidence that, but for the constitutional error, no reasonable jury would have convicted the

petitioner.  The record is adequate to dispose fully and fairly of Vizcarra's claims.  The Court

need inquire no further on collateral review and an evidentiary hearing is not necessary.

## CERTIFICATE OF APPEALABILITY

A petitioner may not appeal a final order in a habeas corpus proceeding "[u]nless a circuit

justice or judge issues a certificate of appealability."[87]  Further, appellate review of a habeas

petition is limited to the issues on which a certificate of appealability is granted.[88]  In other

words, a certificate of appealability is granted or denied on an issue-by-issue basis, thereby

limiting appellate review solely to those issues on which a certificate of appealability is granted.[89]

---

[87] 28 U.S.C. § 2253(c)(1)(B) (2012).

[88] *See Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding that, in regard to the denial of relief in habeas corpus actions, the scope of appellate review is limited to the issues on which a certificate of appealability is granted).

[89] *See* 28 U.S.C. § 2253(c)(3) (setting forth the narrow scope of appellate review in habeas corpus matters); *see also Lackey*, 116 F.3d at 151 (holding that a certificate of appealability is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *but see United States v. Kimler*, 150 F.3d 429, 431 n.1 (5th Cir. 1998) ("We have decided, however, that the monolithic nature of [Federal Rule of Appellate Procedure] Rule 22(b) in conjunction with Congress's mandate for issue specificity on collateral review embodied in 28 U.S.C. § 2253(c)(3) requires a more express request.  In order to obtain appellate review of the issues the district court refused to certify, the petitioner must first make the threshold substantial showing of the denial of a constitutional right. *See* 28 U.S.C. 2253(c)(2).  Only after clearing this hurdle may the petitioner proceed to brief and we review the merits of the rejected issues.").

Although Vizcarra has not yet filed a notice of appeal, this Court nonetheless must address whether he is entitled to a certificate of appealability.[90]

A certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[91]  In cases where a district court rejects a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[92]  To warrant a grant of the certificate as to claims that the district court rejects solely on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."[93]  Here, Vizcarra is not entitled to a certificate of appealability because reasonable jurists would not find debatable the Court's conclusions that his petition is procedurally barred. Accordingly, the Court finds that it should deny Vizcarra a certificate of appealability.

## CONCLUSION AND ORDERS

Upon reconsideration and in light of the Supreme Court's decision in *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), the Court concludes that it should deny Vizcarra's petition and dismiss his civil cause as time barred.  The Court further concludes that Vizcarra is not entitled to a certificate of appealability.  Accordingly, the Court enters the following orders:

---

[90] *See* 28 U.S.C. foll. § 2255 Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

[91] 28 U.S.C. § 2253(c)(2).

[92] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002) (applying *Slack* to a certificate of appealability determination in the context of § 2255 proceedings).

[93] *Slack*, 529 U.S. at 484.

**IT IS ORDERED** that Vizcarra's petition under 28 U.S.C. § 2254 for a writ of habeas corpus (ECF No. 1) is **DENIED**, and his cause is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Vizcarra is **DENIED** a certificate of appealability.

**IT IS ALSO ORDERED** that all pending motions are **DENIED AS MOOT**.

**IT IS FINALLY ORDERED** that the Clerk shall **CLOSE** this case.

**SO ORDERED.**

**SIGNED** this ___14th___ day of May 2015.

_____
**DAVID BRIONES**
**SENIOR UNITED STATES DISTRICT JUDGE**